# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Paulo K. Mwassa, <br><br> Plaintiff, <br><br> v. <br><br> Presbyterian Homes and Services, <br><br> Defendant. | Case No. 19-cv-01511 (SRN/HB) <br><br><br> **MEMORANDUM ORDER AND OPINION** |

Paulo K. Mwassa, 2650 Scotland Ct., Apt. 208, Mounds View, MN 55112, Plaintiff, Pro Se.

Meggen E. Lindsay and Penelope J. Phillips, Felhaber Larson, 220 S 6th St. Suite 2200, Minneapolis, MN, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 91] and Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 97]. Based on a review of the files, submissions, and proceedings herein, and for the reasons set forth below, the Court **GRANTS** Defendant's motion, and **DENIES** Plaintiff's motion.

## I.    BACKGROUND

### A.    Parties

Defendant Presbyterian Homes and Services ("PHS") is the operator of Waverly Gardens, a senior living community located in North Oaks, Minnesota. (Nelson Decl. [Doc. No. 94-2] ¶ 3.)

Plaintiff Paulo Mwassa ("Mwassa") is a resident of Minnesota, and is a black man of Ugandan descent. (Compl. [Doc. No. 1] ¶ 10.) He worked as a Trained Medication Assistant and Resident Assistant at Waverly Gardens until his termination on June 12, 2018. (Nelson Decl. ¶¶ 4; 17.) During his tenure at Waverly Gardens, Mwassa received favorable performance evaluations, and his file contained no corrective actions or coworker complaints. (Lindsay Decl. [Doc. No. 94], Ex. A (Pl.'s Performance Summary); Prigge Decl. [Doc. No. 94-3] ¶ 6.) In his position, he provided care to residents who are considered vulnerable adults under the Minnesota Vulnerable Adults Act, Minn. Stat. § 626.5572, subds. 6, 21.

### B.    Mwassa's Alleged April 4, 2018 letter to Waverly Gardens Care Center Administrator Alana Nelson Regarding Racial Discrimination

Mwassa contends that he wrote a letter to Waverly Gardens Care Center Administrator Alana Nelson ("Nelson") on April 4, 2018, alleging that he was the victim of racial discrimination by a floor supervisor, Terry Beach ("Beach"). (Pl.'s Decl. [Doc. No. 101] [1], Ex. 5 (April. 4, 2018 Mwassa Letter).) Several months prior to writing the letter, Mwassa alleges that he shared his concerns regarding racial discrimination in the workplace with a colleague, Jean Alexis ("Alexis"), who worked as a Certified Nursing Assistant at PHS, and who is black. (Pl.'s Decl., Ex. 4, (Alexis Decl.) at 1.) On April 4,

---

[1] Plaintiff's Exhibits 1–85 are found at docket number 101, exhibits 86–115 are found at docket number 102. The declaration found at docket number 101 refers to both sets of exhibits.

2018, Mwassa alleges that he told Alexis about the letter he had written to Beach. (*Id.* at 2.)

In the letter, Mwassa alleges that Beach treated him differently from coworkers who were not black. (*Id.*, Ex. 5 (April. 4, 2018 Mwassa Letter).) He alleges that Beach discriminated against him when she (1) told him to go back to Africa; (2) called him lazy; and (3) talked to a resident about how black employees at PHS are "not good," and that they are "ugly, rude, mean and rough." (*Id.*) Mwassa also alleges that Beach encouraged a resident to falsely accuse black employees of abuse and neglect. (*Id.*) Finally, Mwassa alleges that he confronted Beach about their last conversation, and that she apologized to him. (*Id.*)

Mwassa testified that he wrote the letter on a computer at his local public library because his own computer had broken down, and he did not save an electronic version of the letter—choosing instead to print two or three copies of the letter. (Mwassa Dep. [Doc. No. 94-1] at 107–108, 150.) He has since discarded his computer, although he does not recall how he disposed of it. (*Id.* at 150.)

Mwassa claims that he placed a copy of the letter in the folder outside Nelson's office and later discussed his concerns with Nelson after she received the letter. (*Id*. at 111; Pl.'s Opp'n Mem. [Doc. No. 99] at 5.) Nelson, however, has no recollection or record of receiving or seeing such a letter. (Nelson Decl. ¶¶ 5–6.)  Nelson contends that at no point during Mwassa's employment did he ever make a verbal or written report of discrimination to her. (*Id*.)

### C.     April 19, 2018 Vulnerable Adult Report

On April 19, 2018, PHS submitted an incident report to the Minnesota Department of Health regarding the alleged mistreatment of a resident at Waverly Gardens. (Lindsay Decl., Ex. B (Vulnerable Adult Report); Prigge Decl. ¶ 6.) The resident alleged that a "dark colored, clean cut man touched him inappropriately while changing [the resident's] briefs." (Lindsay Decl., Ex. B (Vulnerable Adult Report) at 2.) The only nurse on duty who fit the description was Mwassa, and pursuant to policy, PHS immediately placed him on paid administrative leave while it investigated the allegation. (Prigge Decl. ¶ 6.) Mwassa contends that the resident in question was the same resident whom Beach had earlier encouraged to file a false report of abuse and neglect. (Pl.'s Opp'n Mem. at 7.) Following the investigation of the alleged abuse, the report was found to be unsubstantiated and Mwassa returned to work without any loss of pay. (Prigge Decl. ¶ 6.)

Mwassa further alleges that Nelson admitted that he was placed on leave because of racial profiling, and apologized for "racially targeting" Mwassa when she found out that the report was unsubstantiated. (Compl. ¶ 14; Pl.'s Decl., Ex. 114 [Doc. No. 102] (Pl.'s Interrog. Answers) at 9.)

### D.     June 7, 2018 "Spy Pen" Incident

At 4:45 a.m. on the morning of June 7, 2018, a female resident assistant ("RA") at PHS discovered a video recording device that was designed to look like a pen in one of the staff bathrooms (the "spy pen"). (Lindsay Decl., Ex. C (Description of Incident) at 1.) The device was taped in such a way that it pointed at the toilet. (*Id.*) The RA cut the tape holding the pen and noticed it was hot to the touch. (*Id.*) This made her suspect that it was not a

normal pen, and that it had been "running/recording" for "quite some time." (*Id.*) She left some of the tape under the sink, hoping to later see who went into the bathroom to remove the tape. (*Id.*) She then exited the bathroom, and brought the spy pen to a desk where she inspected it. (*Id.* at 1–2.) Upon closer inspection, the RA noticed a "glare that look[ed] like a camera lens." (*Id.* at 1–2.)

The RA contends that when Mwassa saw her inspecting the device, she shared with him her suspicion that it was a "spy pen." (*Id.* at 2.) When Mwassa asked to see it, the RA refused and asked him to wait while she continued to remove the tape. (*Id.*) When she removed more tape, the RA saw a possible power button and a USB port, leading her to believe it was a video camera. (*Id.*) Mwassa then took the device, saying, "This can't be a spy pen. There's no such thing." (*Id.*) Mwassa alleges that he asked her to plug the device into her personal laptop, but the RA refused. (*Id.*, Ex. M (Police Interview) at 4.)

Mwassa asserts that he then took the spy pen to a training room, which contained several computers, in order to view the contents of the USB drive. (*Id.* at 5.) He claims that he could not determine where to plug in the USB port, and he was also doubtful the USB would work, as it appeared loose. (*Id.* at 5,17.) The RA estimated Mwassa was gone for 10-15 minutes, and when he returned, he claimed there was nothing on the USB drive. (*Id.*, Ex. C (Description of Incident) at 2.) He then handed the spy pen back to the RA, who found that it felt lighter, as if the internal mechanism had been removed. (*Id.*) She also noticed that the USB port was broken and disconnected from the device. (*Id.*) Mwassa contests this, and claims he returned the spy pen in its original condition, having simply

removed tape that had added structure and weight to the device. (*Id.*, Ex. M (Police Interview) at 20–21.)

The RA contends that after Mwassa returned with the device, he discouraged her from turning it over to management. (*Id.*, Ex. C (Description of Incident) at 2.) She disagreed and gave the pen to the shift supervisor, reporting how she had found it. (*Id.*) The two of them went to the bathroom where the RA had initially discovered the device. (*Id.*, Ex. D (Handwritten Incident Description).) The remaining tape had since been removed, but the supervisor touched the pipe where it had been affixed and noted that it felt sticky. (*Id.*) Mwassa denies having entered the bathroom to remove the tape. (*Id.*, Ex. M (Police Interview) at 23.) When the RA and shift supervisor returned to the work area, they both filed incident reports. (*Id.*, Ex. D (Handwritten Incident Description); *Id.*, Ex. C (Description of Incident) at 3.)

### E. Mwassa's Alleged June 7, 2018 letter to Human Resources Manager Tricia Prigge

Mwassa contends that he sent a letter alleging that he was a victim of racial discrimination in the work place and a hostile work environment to Human Resources Manager Tricia Prigge ("Prigge") on June 7, 2018. (Pl.'s Decl., Ex. 6 (June 7, 2018 Letter).) In the letter, Mwassa detailed three specific examples of alleged racial discrimination by Beach: (1) she imitated his voice and accent over the "radio talkies;" (2) she accused Mwassa of hiding while he was in a resident's room; and (3) she made the statement, "I don't know why Management hired Africans, all you guys do is [] hide from work." (*Id.*) In the letter, Mwassa also expressed concern that Nelson was targeting him after his April

4, 2018 letter, and stated his belief that she was "singling [him] out" and trying to find an excuse to fire him. (*Id.*)

Mwassa testified that he typed this letter at a computer at the public library. (Mwassa Dep. at 114.) There is no electronic record of this letter, and Mwassa alleged he mailed a paper copy to Prigge shortly after he was placed on administrative leave. (*Id.*)

Conversely, Prigge testified that she did not receive this letter. (Prigge Decl. ¶ 3–4.) She further testified that she never received a verbal or written report of discrimination from Mwassa. (*Id.* ¶ 3.)

### F.    The Investigation of the Spy Pen Incident

Nelson contacted Mwassa at 3:00 p.m. on June 7, 2018 to advise him that he had been placed on administrative leave pending an investigation of the spy pen incident. (Lindsay Decl., Ex. E (Nelson June 7, 2018 Note).) She also contacted the police about the incident. (*Id.*, Ex. G (Incident Report).)

During the investigation, Nelson reviewed video surveillance cameras and discovered that Mwassa entered the bathroom in which the RA discovered the spy pen six times between 1:59 a.m. and 4:00 a.m. on June 7, 2018. (Lindsay Decl., Ex. I (Timeline of Surveillance Footage); *Id.*, Ex. J (Notice of Termination).) The first time Mwassa entered the bathroom, his hand was in his front pocket, and he remained in the bathroom for seven minutes. (*Id.*, Ex. I (Timeline of Surveillance Footage).) The RA had informed Mwassa that she planned to take a break during this approximate time period. (*Id.*, Ex. H (Nelson Email).) Mwassa's next five trips to the bathroom were only 20-30 seconds long. (*Id.*, Ex. I (Timeline of Surveillance Footage).) Mwassa explained his frequent use of that particular

bathroom by pointing out the other bathroom in the area was out of paper towels, and that as an RA he was required to wash his hands many times during his shift. (*Id.*, Ex. M (Police Interview) at 25.)

Mwassa was interviewed a few days later, on June 11, 2018, by Ramsey County Sheriff's Deputy Joshua Adams, as well as Nelson and Prigge. (*Id.*, Ex. L (Case Notes).) During the interview, Mwassa was asked questions about the spy pen incident, and he was shown the video footage collected by PHS. (*See id.*, Ex. M (Police Interview).) He denied placing the spy pen in the bathroom, denied the spy pen belonged to him, and denied tampering with the device beyond attempting to plug it into several computers. (*Id.* 3–5, 16–7, 21.) However, Nelson and Prigge concluded that Mwassa provided inconsistent and evasive answers during the interview. (*Id.*, Ex. J (Notice of Termination) at 1.) Specifically, when the officer first asked Mwassa if he had ever purchased a spy pen like the one found, Mwassa answered "no, never," but when the officer asked him if a review of Mwassa's bank records and other personal accounts would confirm this, he admitted that he had "purchased one, but not like that one." (*Id.*, Ex. M (Police Interview) at 7.)

Mwassa alleges that during this interview Prigge asked Mwassa "to stop accusing [Nelson and Prigge] of bias and unfair treatment." (*Id.*, Ex. 113 (RFAs) at 9.) He also alleges that Nelson said, "black people are criminal in nature" to Prigge during the investigation. (Compl. ¶ 17; Pl.'s Decl., Ex. 114 (Pl.'s Interrog. Answers) at 9.) However, the transcript provided by Defendant does not contain any comments by Prigge, Nelson, or Mwassa about discrimination or unfair treatment. (*See* Lindsay Decl., Ex. M (Police Interview).) Instead, while Mwassa is recorded as saying the RA who found the spy pen

"set him up," (*id.* at 19), he also acknowledged that he had been "good friends" with the RA prior to this incident. (*Id.* at 31.)

Nelson and Prigge then interviewed the RA, and reviewed her written statement. (*Id.*, Ex. O (Nelson June 12, 2018 Note) at 1.) The RA reiterated that when she found the spy pen it did not appear broken or "loose," as Mwassa claimed. (*Id.* at 3.) She also reported that Mwassa appeared "nervous" or "scared" during their conversation. (*Id.* at 4.)

Following the June 11, 2018 interviews, PHS decided to terminate Mwassa's employment. Prigge called Mwassa on June 12, 2018 to notify him of PHS's decision, and to read the Notice of Termination to him. (*Id.*, Ex. J (Notice of Termination).) The termination notice explained that PHS was terminating Mwassa's employment because it had "lost confidence in [Mwassa's] ability to maintain its standards and Code of Conduct." (*Id.*) In particular, PHS noted inconsistencies between Mwassa's June 11 interview statements and "other employees' statements (spy pen having missing pieces, tape no longer attached to the toilet, usage of the bathroom, changing your answer as to whether or not you've ever purchased a camera like the one found)." (*Id*. at 2.)

After his termination, on July 3, 2018, Mwassa was also charged via complaint in state court with a gross misdemeanor for interference with privacy under Minn. Stat. § 609.746. (*Id.*, Ex. P (Summons and Compl.).) On August 8, 2018, the charge was dismissed for lack of probable cause, and on January 3, 2019 the record of Mwassa's criminal charge was expunged. (*Id.*, Ex. Q (Dismissal of Compl.); Pl.'s Decl., Ex. 11 (Order Sealing Record); *Id.*, Exs. 15–17 (Letters Confirming Expungement).)

### G.    Mwassa's Alleged June 11, 2018 letter to PHS CEO Dan Lindh

After the conclusion of the investigatory interview on June 11, 2018, Mwassa contends that he wrote a third letter complaining about discrimination, this time to PHS's CEO, Dan Lindh. (Pl.'s Decl., Ex. 7 (June 11, 2018 Letter).)

Mwassa testified that he wrote this letter immediately after the June 11 interview with Prigge, Nelson, and Deputy Adams. (Mwassa Dep. at 116.) He alleges that he wrote this letter at the Maplewood library, as his usual library was closed, and he then mailed it to Lindh. (*Id.* at 116–17.) Neither party submitted evidence showing that Lindh ever received this letter.

### H.    Mwassa's EEOC Charge

On September 8, 2018, Mwassa filed a charge with the EEOC, alleging discrimination based on race, national origin, and retaliation. (Lindsay Decl., Ex. S (EEOC Compl.).) In the charge, he contended he was "subjected to different term[s] and conditions of employment" and a "hostile work environment where [he] was falsely accused of [wrongdoing]." (*Id.*) Mwassa also claimed that he had been "racially profiled," and "subjected to investigations and discipline." (*Id.*) He stated that he had "internally reported discrimination on more than one occasion" but was subject to discriminatory retaliation "for participating in protected activity in violation of Title VII of the Civil Rights Act." (*Id.*)

In the intake interview associated with the charge, Mwassa was asked if he had reported discrimination to his employer, and he answered that he had reported it to Nelson, verbally, in April of 2018. (*Id.*, Ex. T (Intake Notes) at 2.) He denied having filed any

written discrimination complaints. (*Id.*) Subsequently, however, in a letter to the EEOC dated December 4, 2018, Mwassa stated that that he had written the April 4, 2018 and June 7, 2018 letters to PHS staff alleging discrimination, but did not mention the June 11, 2018 letter to Lindh. (*Id.*, Ex. U (Pl.'s Response to EEOC).)

The EEOC dismissed Mwassa's charge on March 15, 2019, and issued him a right to sue letter. (*Id.*, Ex. V (Right to Sue Letter).)

## I.     The Lawsuit

On June 7, 2019, Mwassa filed suit against PHS, alleging violations of Title VII of the Civil Rights Act. 42 U.S.C. §§ 2000e, *et seq.* Mwassa is self-represented and used a form complaint for employment discrimination lawsuits, alleging discrimination based on race and national origin. Under the clause describing the nature of his case, Mwassa checked the following boxes indicating the type of conduct at issue: "Termination of [his] employment," "Failure to promote," "Terms and conditions of employment differ from those of similar employees," "Retaliation," "Harassment," "Racial Profiling," "Defamation," and "Malicious Prosecution or Abuse of Process." (Compl. ¶ 8.) PHS now moves for summary judgment on all of Mwassa's claims.

## II.   DISCUSSION

A court may grant a party summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment "'must set forth specific facts showing that there is a genuine

issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

A dispute of fact is "genuine" if "a factfinder could reasonably determine the issue in the non-moving party's favor." *Zayed v. Associated Bank*, N.A., 913 F.3d 709, 714 (8th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). A factfinder's determination of an issue is only reasonable if "it is based on 'sufficient probative evidence' and not on 'mere speculation, conjecture, or fantasy.'" *Id.* (citing *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018)). This circuit has also held that a properly supported motion for summary judgment cannot be defeated with only self-serving affidavits. *Meeks v. Dept. of Human Services*, 732 Fed. Appx. 486 (8th Cir. 2018) (citing *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006)).

### A.    Title VII

#### 1.    Applicable Law

Pursuant to Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice" for an employer to, among other things, "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012). Absent "direct evidence of discrimination," the Court analyzes Title VII discrimination claims under "the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Stone v. McGraw Hill Fin.*, Inc., 856 F.3d 1168, 1174 (8th Cir. 2017) (internal quotations

omitted); *see also Watson v. McDonough*, 996 F.3d 850, 854 (8th Cir. 2021) ("Where, as here, the plaintiff has not presented direct evidence to support [his] Title VII claims, we apply the burden-shifting framework established in *McDonnell Douglas*.").

Title VII also prohibits "retaliation on account of an employee having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-3(a) (2012) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter.")). To establish a prima facie case of retaliation, Mwassa must show that "(1) [he] engaged in protected conduct, (2) [he] suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct." *Bunch v. Univ. of Ark. Bd. of Tr.*, 863 F.3d 1062, 1069 (8th Cir. 2017). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which requires proof that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

### 2. Allegations of Racial and National Origin Discrimination

#### a. Allegations of Direct Evidence of Racial and National Origin Discrimination.

Mwassa contends that there is direct evidence of racial and national origin discrimination in the record. (Pl.'s Opp'n Mem. at 20.) Direct evidence of racial and national origin discrimination is evidence showing "a specific link between the alleged

13

discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (citations omitted). In this context, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.*

Specifically, Mwassa asserts that the record contains direct evidence of racially discriminatory statements made by Beach, Nelson, and Prigge. (Pl.'s Mem. at 39.) He cites to a comment Nelson made to Prigge that "black people are criminal in nature,"  comments by Beach to the effect of, "I don't know why Management hired Africans, all you guys do is [] hide from work," and Beach's mockery of Mwassa's voice on the "walkies." (Pl.'s Decl., Ex. 6 (June 7, 2018 Letter); *Id.*, Ex. 114 (Pl.'s Interrog. Answers) at 9.) The Court finds no reference to a specific discriminatory remark uttered by Prigge in Mwassa's complaint, exhibits or memorandum.

However, as to any allegedly discriminatory statements made by Beach, importantly, Mwassa fails to point to evidence in the record that Beach was a decisionmaker with respect to his termination. "[N]ot every prejudiced remark made at work supports an inference of illegal employment discrimination," and the Court must "carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process . . . from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *see Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) (remark by a county employee with no hiring authority, that hiring plaintiff would be "like raising terrorist

kids," was not direct evidence of employment discrimination because record contained no evidence the employee influenced the hiring decision). Thus, even assuming that Beach made statements that were discriminatory and were motivated by racial animus, there is no evidence in the record that Beach influenced the decision to terminate Mwassa's employment, and no evidence that she had such authority. Instead, it was Nelson and Prigge who terminated Mwassa, after confirmation from PHS's Regional Human Resources Manager, Elizabeth West. (Pl.'s Decl., Ex. 83 (Emails regarding Mwassa's Termination).) Therefore, Beach's comments are not direct evidence of employment discrimination because Mwassa shows no link between Beach's allegedly discriminatory statements and PHS's decision to terminate his employment.

For Nelson's remark to be considered direct evidence of racial or national origin discrimination in the decision to terminate Mwassa, the remark "must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Torgerson*, 643 F.3d at 1045. *Compare Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213–14 (8th Cir. 2001) (holding that a school board president's statements that "a woman can't handle [the administrator's] job" and that the employee was "a woman in a man's job" are direct evidence of sex discrimination when the board voted not to renew the administrator's contract), *with Arraleh*, 461 F.3d at 975 (holding that a comment by a director with hiring authority that "black people are expected to leave their blackness behind" was not direct evidence without some context to show a link between the comment and the decision not to hire the employee).

Although Mwassa alleges that Nelson uttered the phrase, "black people are criminal in nature"—a fact that Nelson denies and that is not corroborated by any other evidence in the record, (Compl. at ¶ 17; Pl.'s Decl., Ex. 114 (Pl.'s Interrog. Answers at 9))—even if true, this alleged isolated remark, without more, is not sufficient to show a "specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Torgerson*, 643 F.3d at 1046 (holding a comment by a member of the hiring committee that a successful applicant was "a big guy and that he'd make a good firefighter" was not direct evidence of gender discrimination against unsuccessful female applicant).

> **b.   Allegations of Indirect Evidence of Racial and National Origin Discrimination: The Analysis under McDonnell Douglas**

The Court turns now to the *McDonnell Douglas* burden-shifting analysis. Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that "[1] he is a member of a protected class . . . [2] he met [his employer's] legitimate employment expectations," [3] "he suffered an adverse employment action, and [4] the circumstances give rise to an inference of discrimination based on" race, national origin, or religion. *Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016). If the plaintiff establishes a prima facie case, the burden shifts to the employer "to 'articulate a legitimate, nondiscriminatory reason' for the adverse employment action." *Stone*, 856 F.3d at 1174 (citations omitted). If the employer does so, "'[t]he burden then shifts back to [the plaintiff] to prove that the proffered reason is pretext

for discrimination.'" *Id*. (citations omitted). At all times, however, the plaintiff retains the "ultimate burden of proof and persuasion." *Id.*

PHS does not dispute that Mwassa is a member of a protected class, nor that he met PHS's legitimate employment expectations (Def.'s Mem. at 20–21; Lindsay Decl., Ex. A (Pl.'s Performance Summary).) In addition, PHS does not dispute that Mwassa suffered at least one adverse employment action—his termination. (Def.'s Reply [Doc. No. 109] at 6.) Consequently, the only issues in dispute are whether Mwassa suffered more than one adverse employment action, and whether the evidence gives rise to an inference of discrimination based on race or national origin.

### (i)       Alleged Adverse Employment Actions

Mwassa claims that he experienced several adverse employment actions. Specifically, he alleges that he was passed over for a promotion, placed on administrative leave, subjected to unwarranted investigations, and was ultimately terminated. (Pl.'s Opp'n Mem. at 33.)

An adverse employment action is a "material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Singletary v. Missouri Dep't of Corr.*, 891 (8th Cir. 2005) (holding that an administrative leave pending an investigation, was not an adverse employment action); *Jones v. Fitzgerald*, 285 F.3d 705, 714–15 (8th Cir.2002) (holding that two warranted internal investigations of the plaintiff where she was not disciplined or threatened with discipline, caused her "no material disadvantage in a term or condition of employment," and therefore were not adverse employment actions); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007–08 (8th Cir. 2012)

(finding the suspension of an employee with pay while the employer investigated the employee's absence from work was not an adverse employment action).

PHS contends that Mwassa is precluded from arguing that being passed over for a promotion or enduring allegedly unwarranted investigations were adverse employment actions because he failed to raise them in his EEOC complaint. (Def.'s Reply at 5.) Additionally, PHS contends that because placement on paid leave is not legally considered an adverse employment action, Mwassa's claim in that regard fails. Thus, PHS argues that only Mwassa's termination can constitute an adverse employment action. (*Id.* 5–6.)

The Court finds that Mwassa waived any claim he may have had that he was passed over for a promotion because of racial animus or national origin discrimination because he failed to allege it in his EEOC complaint. A Title VII plaintiff must exhaust his administrative remedies for each claim before bringing suit in federal court. *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006). Once the EEOC provides a plaintiff with a right to sue letter, the plaintiff is limited to seeking relief for discrimination "that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Id.* This ensures that the defendant is given appropriate notice of all claims the plaintiff has, and gives appropriate deference to the EEOC's "investigatory and conciliatory role." *Id.* As Mwassa did not allege that PHS failed to promote him in his initial complaint, or any of the subsequent letters he sent to the EEOC, he cannot rely on it as a basis for alleging an adverse employment action here.

Mwassa did briefly raise concerns with "baseless investigations" in his EEOC complaint, likely in reference to PHS's investigation into a reported case of abuse on April

19, 2018, and its investigation of the June 7, 2018 spy pen incident. (Lindsay Decl., Ex. S (EEOC Compl.).) However, the Eighth Circuit has found that "unwanted investigations" that are "predicated on complaints . . . do not rise to the level of an adverse employment action." *Singletary*, 423 F.3d at 892 n. 5. Because PHS's June 7th, 2018 report was predicated on the report by the RA who found the spy pen, and the April 19, 2018 investigation was predicated on a resident's report of abuse by a nurse matching Mwassa's description, neither were adverse employment actions taken by PHS. (Lindsay Decl., Ex. B (Vulnerable Adult Report).).

Likewise, this circuit has found that a paid administrative leave pending an investigation is not an adverse employment action. *Singletary*, 423 F.3d at 892 n. 5 (holding that that an administrative leave during which the plaintiff maintained his pay, grade, and benefits, and after which plaintiff was restored to original position, was not an adverse employment action). Mwassa was placed on paid administrative leave while PHS investigated a complaint of abuse, as required by PHS policy. (Lindsay Decl., Ex. B (Vulnerable Adult Report); Prigge Decl. ¶ 6.) This administrative leave was not a material employment disadvantage, as Mwassa retained his pay and benefits, and he was immediately returned to his previous position once PHS determined the complaint was unsubstantiated. (Prigge Decl. ¶ 6.)

Accordingly, only Mwassa's termination constitutes an adverse employment action.

### (ii)     Evidence of an Inference of Discrimination

The Court will assume, without deciding, that there is evidence in the record that could give rise to an inference of racial and national origin discrimination. Accordingly,

the Court proceeds to analyze the remaining *McDonnell Douglas* factors on the assumption that Mwassa has established a prima facie case of racial discrimination. *See Smith v. United Parcel Serv.*, 829 F.3d 571, 575 (8th Cir. 2016) ("We presume for purposes of analysis that [Plaintiff] has satisfied [the prima facie case] requirement."); *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012) (assuming that plaintiffs established a prima facie case of race discrimination and affirming grant of summary judgment because there was insufficient evidence that employer's actions were pretext for discrimination).

c.      **PHS's Proffered Reason for Mwassa's Termination**

If the Court assumes that Mwassa has made a prima facie case of race and national origin discrimination, the burden then shifts to PHS "to 'articulate a legitimate, nondiscriminatory reason' for the adverse employment action."  *Stone*, 856 F.3d at 1174 (citations omitted). "In determining whether an employer had a legitimate reason for firing an employee, a court considers not whether 'the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *King v. Minnesota Guardian Ad Litem Board*, No. 19-cv-2108 (NEB/TNL), 2021 WL 1820240, at *7 (D. Minn. May 6, 2021) (finding an employer had articulated a non-pretextual reason for plaintiff's termination when the employer noted that, based on an in-depth investigation into plaintiff's conduct, the employer had lost trust and confidence in plaintiff's ability to complete his work, and manage his staff) (citing *McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 861–62 (8th Cir. 2009)).

PHS contends that it terminated Mwassa because it lost confidence in his ability to be forthright during an investigation. Mwassa's termination notice explained that this loss of confidence was based on "the inconsistencies between [Nelson and Prigge's] conversation with [Mwassa] on 6/11/2018 vs. the video camera footage [PHS] reviewed and other employee statements." (Lindsay Decl., Ex. J (Notice of Termination).) Specifically, it noted details such as the fact that the spy pen had missing pieces, tape had been removed from the toilet, Mwassa had used the bathroom six times in the approximately two hours before the RA discovered the pen, and Mwassa had provided inconsistent answers about whether he had ever purchased such a recording device. (*Id.*) The Court finds that PHS, in detailing concerns with Mwassa's conduct during its investigation, has proffered a non-discriminatory reason for Mwassa's termination.

### d.   Pretext

Because PHS has provided a legitimate, nondiscriminatory reason for terminating Mwassa based on the spy pen incident, the burden shifts back to Mwassa to show that PHS's reason was a mere pretext for discrimination based on race or national origin. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). At all times, however, the plaintiff retains the "ultimate burden of proof and persuasion." *Stone*, 856 F.3d at 1174. This burden is heavier than the showing required to establish a prima facie case: "[a]n employee's attempt to prove pretext or actual discrimination requires more substantial evidence . . . because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) (citations omitted).

"A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Gibson*, 670 F.3d at 853–54 (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir.2010)). The Eighth Circuit has described two routes for raising a genuine issue of material fact in dispute as to pretext. *Id.* "First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact. Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Id.*

Mwassa argues that PHS treated white employees more favorably than black employees, and contends "no action was taken on Terry Beach, no matter how [many complaints] PHS received [] about her." (Pl.'s Opp'n Mem. at 44–45.) Mwassa also relies on unsupported assertions that PHS provided false information to the police investigating the spy pen incident. (Pl.'s Opp'n Mem. at 38.) In response, PHS urges the Court to review the depth of its investigation into Mwassa's conduct, including the evidence that it gathered before it decided to terminate Mwassa. (Def.'s Mem. at 23.)

### (i)  Alleged Disparate Treatment of Similarly Situated Employees

In order for Mwassa to raise a genuine issue of material fact in dispute as to whether PHS's proffered reason was pretextual, he must identify evidence in the record of the disparate treatment of a similarly situated employee. *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012) (finding comparators must be "similarly situated in all relevant respects"). This is a rigorous standard and similarly situated employees must have the same

22

position, responsibilities, and work location. *Riser v. Target Corp.*, 458 F.3d 817, 822 (8th Cir. 2006) (holding employees were not similarly situated when their duties varied, they had different responsibilities, and they worked different shifts).

Mwassa alleges that PHS engaged in disparate treatment with respect to Beach, and alleges that "no action was taken" on complaints against her. (Pl.'s Opp'n Mem. at 44–45.) Beach was a floor supervisor, while Mwassa was a Resident Assistant — they did not have the same position nor the same job responsibilities, and were therefore not similarly situated employees. The Eighth Circuit also requires plaintiffs to provide evidence that comparators have engaged in similar conduct, and were disciplined in different ways. *Chappell*, 675 F.3d at 1119 (finding a plaintiff had not pointed to evidence showing employees had committed the "same offense" or how they were disciplined, thus there was no evidence that employees were similarly situated). Mwassa accused Beach of making racist and discriminatory comments to Mwassa and other employees of color, whereas PHS lost trust and confidence in Mwassa during the investigation of a possible crime. These offenses are not similar, and thus Beach and Mwassa were not similarly situated in all respects.

Mwassa's additional claim that "white employees were treated far more favorably" than black employees does not meet the standard of "specific, tangible evidence" that is required for a claim of disparate treatment. *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 725 (8th Cir. 2019) (citing *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 n.4 (8th Cir. 1998) (finding "bald assertions of favoritism" and allegations that "white

23

employees received promotions for which they were not qualified" were insufficient to raise a genuine issue of material fact in dispute regarding disparate treatment)).

### (ii)   Allegation That Proffered Reason For Termination Had No Basis in Fact

Mwassa also alleges that PHS's proffered reason was not based in fact because the investigation into the spy pen was a sham. (Pl.'s Opp'n Mem. at 38.) In analyzing whether PHS's investigation and findings were a sufficient basis for Mwassa's termination, "[t]he proper inquiry is not whether [PHS] was factually correct in [its investigatory findings]," but rather whether it "honestly believed that" Mwassa engaged in the conduct at issue. *Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (holding an employer's investigation into a threatening phone call was sufficient when coworkers identified the caller as an employee based on his voice, even though the employer did not have "solid proof" of the caller's identity).

The record establishes that Mwassa entered the bathroom where the spy pen was found while he knew his coworker was on break, and he stayed there for seven minutes. (Lindsay Decl., Ex. I (Timeline of Surveillance Footage); *Id.*, Ex. J (Notice of Termination).) He then reentered that same bathroom five more times in a two-hour span, staying for only 20-30 seconds each time. (*Id.*, Ex. I (Timeline of Surveillance Footage); *Id.*, Ex. J (Notice of Termination).) Additionally, Mwassa originally denied having purchased a spy pen, but later hedged his answer, stating that he had purchased one, but it was unlike the device that was found. (*Id.*, Ex. M (Police Interview) at 7.) The RA who found the device testified that after Mwassa took it from her in an alleged effort to view

any recordings, he returned it to her in an altered state, with the USB port broken. (*Id.*, Ex. C (Description of Incident) at 2.) She also testified that Mwassa appeared "nervous" and "scared" during their interactions regarding the device. (*Id.*; *Id.*, Ex. O (Nelson June 12, 2018 Note) at 4.)

Contrary to Mwassa's assertions, there is simply no evidence in the record that would permit a reasonable jury to find that PHS terminated Mwassa because of discriminatory animus. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (finding a plaintiff who was terminated for insubordination was not able to establish pretext when he engaged in "abusive, derogatory conduct towards his employer"). In fact, the evidence overwhelmingly indicates the opposite. These facts show that PHS conducted in an-depth investigation into the spy pen incident, and then articulated a legitimate, nondiscriminatory, non-pretextual reason to terminate Mwassa based on this investigation. Accordingly, Mwassa's allegations of race and national origin discrimination fail for lack of evidence of a triable issue of fact as to pretext.

### 3.   Retaliation/Reprisal Claims

The Court now turns to Mwassa's retaliation and reprisal claims. As discussed above, to survive summary judgment on those claims, Mwassa must establish a prima facie case of retaliation by showing that "(1) [he] engaged in protected conduct, (2) [he] suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct." *Bunch*, 863 F.3d at 1069.

The causation element must be proved "according to traditional principles of but-for causation," which requires proof that "the unlawful retaliation would not have occurred

25

in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. Temporal proximity alone is generally "insufficient to demonstrate a genuine issue of material fact as to whether conduct was retaliatory." *Bunch*, 863 F.3d at 1069 (citing *Kiel*, 169 F.3d at 1136). If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a nondiscriminatory reason for the adverse employment action. *Hunt*, 282 F.3d at 1028. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Id.*

### a.   Mwassa's Alleged Protected Conduct

PHS argues that Mwassa fails to proffer evidence that he engaged in any protected conduct. (Def.'s Mem. at 26.) Mwassa, however, contends that the letters he claims to have sent to Prigge and Nelson, as well as his alleged meetings with them, are in fact protected conduct. For purposes of evaluating this claim, the Court will assume, without deciding, that Mwassa engaged in protected conduct.

### b.   Causation

To establish a prima facie claim of retaliation or reprisal, Mwassa must identify evidence in the record that raises a genuine issue of material fact as to causation—that is, that his protected conduct was a "but-for cause" of his termination. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) ("The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action.") (citation omitted).

PHS argues that Mwassa has failed to identify any such evidence of causation in the record. It argues that PHS had already begun its investigation into the spy pen incident

when Mwassa sent his June 7th, 2018 letter to Prigge and his June 11th, 2018 letter to Lindh, so neither letter can be the basis of a retaliation claim. Further, PHS argues that the length of time between Mwassa's April 4th, 2018 letter to Nelson and his subsequent conversation with Nelson are too far temporally removed from his termination to be the basis of a claim. The Court agrees. Neither the evidence in the record, nor the timeline in this case raise a genuine issue of material fact in dispute on the issue of causation.

As a threshold matter, Mwassa has not presented evidence that PHS received the letters he allegedly sent. The only evidence that the letters were delivered is his own declaration, which stands in conflict with his own earlier statements. (*Compare* Lindsay Decl., Ex. S (EEOC Compl.); *Id.*, Ex. T (Intake Notes) (containing Mwassa's original allegation that he did not submit any written complaints of discrimination during his EEOC intake interview) *with,* Pl.'s Decl., Ex. 1 (Mwassa Decl.) (declaring he sent the April 4, 2018 letter to Nelson, and discussed the letter with her, and that he sent the June 11, 2018 letter to Prigge, and discussed the letter with her).) Such a self-serving declaration is insufficient to raise a triable issue of fact. *St. Hilaire v. Minco Products, Inc.*, 288 F. Supp. 2d 999, 1008 n.11 (D. Minn. 2003) (finding a plaintiff in a disability discrimination case could not "avoid summary judgment by raising issues of material fact through self-serving affidavits and memoranda that directly contradict his sworn deposition testimony without so much as an explanation for the contradictions"). Without identifying evidence in the record that Prigge or other decision makers received his letters, and were aware of his protected conduct, Mwassa cannot establish causation. *Robinson v. Potter*, 453 F.3d 990,

994 (8th Cir. 2006) (finding the plaintiff was unable to "show causation because [no decision-makers] knew about her pending EEOC complaint").

Even if the Court assumes Prigge and Lindh received Mwassa's letters, this protected activity occurred only after his supervisors had begun to investigate the spy pen incident. "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir.2005). And "post-hoc complaints [do] not without more raise a retaliation bar to the proposed discipline because 'the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.' Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy." *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004) (internal citations omitted) (holding complaints of discrimination after an employee received notice of a disciplinary hearing did not support an inference of retaliatory motive).

Even if the Court considers only the April 4, 2018 letter allegedly sent to Nelson before the final investigation, the timeline still does not support an inference of causation. Mwassa relies on the temporal proximity between his April 4, 2018 letter and his termination two months later to establish causation. But "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (internal quotation marks omitted). For instance, when a

woman was discharged 13 days after her family leave started, the Eighth Circuit found that the temporal proximity was "barely" enough to establish causation. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002); *see also Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113–14 (8th Cir. 2001) (noting that a "matter of weeks" between a protected activity and an adverse employment action was sufficient to infer causation). *But see Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (noting that a two-month interval between the employee's termination and her retaliation complaint, by itself, was not enough to establish a causal connection as a matter of law); *and Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010) (finding an interval of one month too long to infer causation). The Court finds that here, the two-month gap between the April 4, 2018 letter to Nelson and Mwassa's termination is insufficient to infer causation.

Accordingly, Mwassa's allegations of retaliation and reprisal fail because of a lack of a triable issue of fact as to causation.

### 4.    Alleged Hostile Work Environment

#### a.    The Law

To survive summary judgment, Mwassa must identify sufficient evidence in the record to raise a triable issue of material fact with respect to all elements of his hostile work environment claim, i.e., (1) that he is a member of a protected group; (2) he was subject to unwelcome harassment based on race or national origin (3) the harassment was because of membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; (5) PHS knew or should have known of the harassment; and (6)

PHS failed to take proper action. *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir. 2003); *Peterson v. Scott Cnty.*, 406 F.3d 515, 523–24 (8th Cir. 2005).

"Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." *Elmahdi*, 339 F.3d at 652. When determining whether harassment is sufficiently severe and pervasive to support a hostile work environment claim, courts consider the totality of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark Cty. Sch. Dist.*, 532 U.S. at 270–271.

The standard for demonstrating a hostile work environment under Title VII is "demanding," and the statute is not intended to "create a general civility code." *Guimaraes v. SuperValu, Inc.*, No. 10-cv-366 (RHK/JSM), 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), *aff'd*, 674 F.3d 962 (8th Cir. 2012); *see Abdel-Ghani v. Target Corp.*, 686 Fed. Appx. 377, 378-79 (8th Cir. 2017) (per curiam) (affirming summary judgment on plaintiff's hostile work environment claims when employees called plaintiff names like "camel jockey, Muslim, Arab, terrorist, and sand [n-word]" approximately ten times in a two-month period); *O'Brien v. Dept. of Agric.*, 532 F.3d 805, 808 (8th Cir. 2008) (affirming summary judgment on plaintiffs' hostile work environment claim despite  evidence that plaintiffs' supervisor embarrassed, isolated, and ostracized them, scrutinized and criticized their work, and increased their work load after the claimants engaged in protected activity); *Martin v. Missouri*, 175 Fed. Appx. 781, 783 (8th Cir. 2006) (affirming summary judgment on plaintiff's hostile work environment claim despite her allegations that coworkers

commented they "were tired of seeing all the black faces on the bulletin board" during Black History Month; someone falsely reported that plaintiff pushed her, and that someone had "keyed" plaintiff's car in the office parking lot and stuck a nail in her tire); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (8th Cir. 2004) (affirming summary judgment despite plaintiff's claim that he overheard offensive racial epithets, about once a month, over the course of two years). "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law," instead, a "a hostile work environment exists only where the conduct complained of is extreme in nature and not merely rude or unpleasant." *Guimaraes*, 2010 WL 5099648, at *9–10 (citation and internal quotations omitted).

### b.      Parties' Positions

Mwassa primarily points to evidence in the record of racist comments and "constant surveillance" as evidence in support of his hostile work environment claim. (Pl.'s Opp'n Mem. at 28–29.) Specifically, he points to Nelson's comment that, "black people are criminal in nature," during the investigation of the spy pen incident, and that Beach "subjected [him] to racist and offensive comments," harassed him over the two-way radios by mocking his accent, and used racial epithets when referring to Africa. (*Id.* at 28–29; Pl.'s Decl., Ex. 114 (Pl.'s Interrog. Answers) at 9.) He relies on the alleged letters to Nelson and Prigge to show that PHS was aware of the hostile work environment. (Pl.'s Decl., Ex. 5 (April. 4, 2018 Mwassa Letter); *Id.*, Ex. 6 (June 7, 2018 Letter).) Mwassa further contends that PHS had a discriminatory surveillance policy, and that "whenever minority employees,

including Plaintiff, were accused of wrong doing, PHS would view security Surveillance in order to find a way to tie them to wrong doing." (Pl.'s Opp'n Mem. at 30–31.)

Again, PHS does not contest that Mwassa is a member of a protected class, nor that Beach's alleged comments, if proven true, would constitute harassment based on Mwassa's race and national origin, because of Mwassa's membership in a protected group. (Def.'s Mem at 37.) Instead, PHS argues that the harassment was not sufficiently severe and pervasive under the law, and that PHS was never made aware of the harassment. (*Id.* at 37, 39.)

### c.    Analysis

The Court finds that even if true, the alleged conduct of PHS staff was not sufficiently severe and pervasive under the law to constitute a hostile work environment. Mwassa fails to point to any evidence in the record of the alleged pervasiveness of Beach's racist comments to corroborate his allegation that they were made on a daily basis. (Pl.'s Opp'n Mem. at 29.) He only cites to Alexis's declaration, which is inadmissible hearsay. (Pl.'s Decl., Ex. 4 (Alexis Decl.);) Fed. R. Evid. 802. There is simply no evidence in the record of conduct so pervasive that it affected a term, condition, or privilege of employment. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) ("[I]nadmissible hearsay evidence cannot be used to defeat summary judgment.").

While certainly morally repugnant if true, the alleged comments in this case did "not constitute a steady barrage of opprobrious racial comment[s]" sufficient to support a hostile work claim. *Elmahdi*, 339 F.3d at 653 (affirming summary judgment despite plaintiff's assertion that he had been called "boy" and "black boy" on a few occasions over a period

of years); *Elnashar v. Speedway SuperAmerica, LLC*, No. 02-cv-4133 (JNE/JSM), 2005 WL 2333832, at *9 (D. Minn. Sept. 22, 2005) (affirming summary judgment on plaintiff's hostile work environment claim despite allegations that plaintiff's supervisor has asked him "whether he had a harem and whether he "rode camels around everywhere in Egypt" as those comments were "isolated incidents that [did] not reach the level of actionable harassment"), *aff'd*, 484 F.3d 1046 (8th Cir. 2007).

Moreover, Mwassa must show that PHS was aware of or should have been aware of the hostile work environment. *See Davis v. Minneapolis Pub. Schools*, No. 10-cv-2638 (DWF/JJK), 2011 WL 6122312, at *10 (D. Minn. Oct. 13, 2011), *R&R adopted*, 2011 WL 6122313 (D. Minn. Dec. 8, 2011) ("Plaintiff's self-serving testimony that MPS should have known about the alleged incidents is insufficient to withstand summary judgment [on his hostile work environment claim].") Beyond his own self-serving allegations, there is no evidence in the record that PHS knew or should have known about a hostile work environment. [2] Thus, Mwassa has not identified a question of triable issue as to whether PHS knew or should have known there was a hostile work environment.

---

[2] Mwassa contends that there is likely evidence that PHS was on notice of the hostile work environment through reviewing Beach's work file, and that PHS obstructed his access to this file and depositions that could have revealed this information. (Def.'s Opp'n Mem. at 34–35.) However, PHS properly disclosed to Mwassa that it had no records of "written complaints or grievances made by employees of Defendant (PHS)[, including Mwassa,] about Terry Beach's discriminatory conduct." (Lindsay Second Decl. [Doc. No. 110], Ex. X (Def.'s RFP and Interrog.) at 12; *Id.* at 6.) Additionally, Mwassa was unable to depose PHS employees not because of PHS's conduct, but because he sought to conduct depositions after the close of discovery, in violation of the court's scheduling order. (Pl.'s Decl., Ex. 107 (Notice of Deposition).)

Accordingly, Mwassa's hostile workplace harassment claim fails for lack of evidence of a triable issue of fact.

**B.      Defamation**

**1.      The Law**

Under Minnesota common law, to prevail on a defamation claim, a plaintiff must establish that the defendant made "(a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 873 (Minn. 2019) (citing *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003)). Minnesota law requires defamation claims to be pleaded with specificity and to include "who made the defamatory statements, to whom they were made, and where." *Walker v. Wanner Engr., Inc.*, 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012).

Both absolute and qualified privileges may defeat a defamation claim. "A defamatory statement is covered by qualified privilege if made in good faith and upon a proper occasion, from a proper motive, and . . . based upon reasonable or probable cause." *Id.* (citations omitted).

However, a privilege may be overcome if the plaintiff shows that the statement was made with malice. *Id.* (citing *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn.

---

Mwassa additionally contends that PHS's discriminatory use of surveillance creates a hostile work environment. (Pl.'s Opp'n Mem. at 30–31.) However, Mwassa has not identified any evidence in the record that indicates PHS is using this footage in discriminatory ways.

2009)). To prove malice, defendant must establish that the statement was made out of "ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Id.* (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980)).

### 2.   Analysis

Mwassa alleges that PHS defamed him by summoning officers to investigate the spy pen incident. PHS responds that Mwassa has not only failed to plead defamation with the specificity required by Minnesota law, its allegedly defamatory communications were protected by a qualified privilege. (Def.'s Mem. at 40.)

The Court finds that Nelson and Prigge's report to the police about the spy pen incident was qualifiedly privileged. PHS reported the spy pen incident to police, because they believed the placement of the recording device constituted a crime. (Nelson Decl. at 3); *Walker*, 867 F. Supp. 2d at 1054 (finding an employer's statement to police that an employee had stolen from the company was qualifiedly privileged and not defamatory when a "reasonable investigation" into the theft was conducted). Mwassa has pointed to no evidence in the record that PHS's report was malicious, and therefore, this report cannot support a defamation claim.

### C.   Malicious Prosecution

### 1.   The Law

Mwassa's claim of malicious prosecution stems from the June 7, 2018 spy pen incident, and the criminal investigation that followed. Malicious prosecution claims are generally disfavored under Minnesota law and thus are "carefully circumscribed." *Bahr v.*

*Cty. of Martin*, 771 F. Supp. 970, 979–80 (D. Minn. 1991) (quoting *Lundberg v. Scoggins*, 335 N.W.2d 235, 236 (Minn. 1983)). Public policy favors prosecutions undertaken in good faith. *See Lundberg*, 335 N.W.2d at 236. "Under Minnesota law, the tort of malicious prosecution includes four elements. The plaintiff must prove that: (1) the defendant initiated criminal proceedings (2) without probable cause and (3) with malice, and (4) the proceedings terminated in the plaintiff's favor." *Young v. Klass*, 776 F. Supp. 2d 916, 922 (D. Minn. 2011).

Malice is a state of mind that must be proven as a fact. *Allen v. Osco Drug, Inc.*, 265 N.W.2d 639, 645 (Minn.1978) (quoting *Hanowitz v. Great N. Ry. Co.*, 142 N.W. 196, 197 (Minn. 1913)). "[M]alice may be, but need not be, inferred from lack of probable cause." *Id.* at 645. Government officials might lack the probable cause necessary to arrest and charge an individual, but not have the malicious state of mind necessary to sustain a claim for malicious prosecution. *See Hanowitz*, 142 N.W. at 197 ("Want of probable cause may exist without malice."). A "mere belief that [an action] was sought with malicious intent is insufficient to establish the existence of a genuine dispute of material fact." *Duham v. Roer*, 708 N.W.2d 552, 570 (Minn. Ct. App. 2006).

### 2.    Analysis

In his Complaint, Mwassa alleges that PHS "racially profiled [him] and got law enforcement involve[d] in a baseless investigation." (Compl. ¶ 17.) Mwassa further contends that "PHS procured [Mwassa's] charges by providing false oral, videos, images and documentary evidence implicating [Mwassa] in a sex crime" (Pl.'s Opp'n Mem. at 50.)

PHS responds that it simply contacted law enforcement to report a suspected crime, and that there is no evidence of any malicious intent on the part of law enforcement in the record. (*Id.*)

Mwassa identifies no evidence in the record in support of his allegations of malicious prosecution. Instead, the evidence demonstrates that PHS made a credible report of suspected criminal activity that had occurred on its premises. Minn. Stat. § 609.746; (Lindsay Decl., Ex. P (Summons and Compl.); *Id.*, Ex. I (Timeline of Surveillance Footage); *Id.*, Ex. C (Description of Incident); *Id.*, Ex. J (Notice of Termination).) Accordingly, Mwassa's malicious prosecution claim fails.

### D.    Abuse of Process

Mwassa's final claim is for abuse of process. Under Minnesota law, the elements for "a cause of action for abuse of process are the existence of an ulterior purpose and the act of using the process to accomplish a result not within the scope of the proceedings in which it was issued, whether such result might otherwise be lawfully obtained or not." *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156, 1171 (D. Minn. 2013) (holding a formulaic recitation of the elements of an abuse of process claim, without factual support of an ulterior purpose, failed to state a claim upon which relief could be granted). The Court must consider whether legal "process was used to accomplish an unlawful end for which it was not designed or intended, or to compel a party to do a collateral act which he is not legally required to do." *Dunham v. Roer*, 708 N.W.2d 552, 571 (Minn. App. 2006) ("The bare allegation that respondent had some greater scheme is insufficient to establish a genuine issue of material fact concerning an unlawful end.") (citing *Kittler & Hedelson v. Sheehan*

*Properties, Inc.*, 203 N.W.2d 835, 840 (Minn. 1973)). Mwassa has identified no evidence in the record to support his abuse of process claim. Accordingly,  Mwassa's claim of abuse of process fails.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant PHS's Motion for Summary Judgment [Doc. No. 91] is **GRANTED**;

2. Plaintiff Motion in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 97] is **DENIED**; and

3. Plaintiff Mwassa's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 4, 2022                              s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge